2015 IL App (2d) 130412
No. 2-13-0412
Opinion filed September 29, 2015

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 03-CF-2565 |
| SANDRA D. ROGERS, | ) ) ) | Honorable John T. Phillips, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Justices Zenoff and Spence concurred in the judgment and opinion.

**OPINION**

¶ 1    In 2013, following a jury trial, defendant, Sandra D. Rogers, was found guilty of committing the offenses of attempted first-degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2002)), home invasion (720 ILCS 5/12-11(a)(2) (West 2002)), and solicitation of murder (720 ILCS 5/8-1.1(a) (West 2002)).  The trial court found that the home-invasion counts, based on great bodily harm, merged with the attempted-murder counts and imposed consecutive prison terms of 15 years for solicitation of murder, 22 years for the attempted murder of Rick Rogers, and 24 years for the attempted murder of Angela Gloria, Rick's wife.  On direct appeal here, defendant challenges the effectiveness of her trial counsel and the trial court's authority to impose her sentence.  We affirm.

¶ 2          I. BACKGROUND

¶ 3 On May 19, 2003, Rick and Angela were at home in Lincolnshire with their two children and two of Rick's children from a prior marriage to defendant. In the early morning hours, Rick and Angela were attacked by an individual wielding a hammer; they suffered severe head and facial injuries as a result of the attack. An investigation led police to arrest Jonathan McMeekin, and he was charged with two counts of attempted murder and other offenses. In July 2003, after giving a statement implicating defendant, McMeekin pleaded guilty to two counts of attempted murder, in exchange for the State's dismissal of the other charges as well as a sentencing cap of 35 years. The trial court later sentenced McMeekin to two consecutive 10-year prison terms.

¶ 4 In July 2003, a grand jury indicted defendant on two counts of attempted first-degree murder, four counts of home invasion, and one count of solicitation of murder. The indictment alleged that defendant, with the intent to kill Rick and Angela, knowingly entered their residence and performed a substantial step toward the commission of murder by striking both of them with a hammer. If further alleged that she asked McMeekin to also commit that offense. In November 2004, defendant entered a fully negotiated guilty plea pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970). Defendant agreed to plead guilty to the two attempted-murder charges, and, in exchange, the State agreed to nol-pros the remaining charges. Defendant and the State agreed to consecutive sentences of 18 years' imprisonment for one count and 12 years' imprisonment for the second count. Defendant did not move to withdraw her plea and did not file a direct appeal.

¶ 5 In March 2005, defendant filed a petition seeking relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2004)), and the trial court summarily dismissed her petition. On appeal, this court held that defendant's postconviction petition set forth the gist of a

claim of ineffective assistance of counsel and that therefore the trial court's dismissal at the first stage was improper. Accordingly, we reversed and remanded for further proceedings. See *People v. Rogers*, 372 Ill. App. 3d 859 (2007).

¶ 6 On remand, defendant filed a second amended petition for postconviction relief in April 2011, and the State filed a motion to dismiss. In September 2011, the trial court denied the State's dismissal motion and ordered it to file an answer. The trial court conducted a hearing in February 2012 and then took the matter under advisement. In May 2012, the trial court granted defendant's second amended postconviction petition. In doing so, the trial court vacated defendant's guilty plea; reinstated all of the charges against defendant; and ordered a trial on all of the charges. The trial court added, "Because of the relief being granted by [*sic*] the Defendant, it is this court's belief that we go back to the status at the time of the presentation of the plea; and all time begins running as of that particular date."

¶ 7 On July 6, 2012, the trial court conducted an arraignment hearing, during which it read the seven counts of the indictment to defendant. The trial court explained that the two counts of attempted first-degree murder were Class X felonies and carried sentences ranging from 6 to 30 years, or 30 to 60 if she were eligible for extended-term sentencing, in addition to mandatory supervised release. The trial court explained that the four counts of home invasion were Class X felonies and carried sentences ranging from 6 to 30 years, or 30 to 60 if she were eligible for extended-term sentencing, in addition to mandatory supervised release. The trial court then explained that the one count of solicitation of murder was a Class X felony and carried a sentence ranging from 15 to 30 years, or 30 to 60 if she were eligible for extended-term sentencing, in addition to mandatory supervised release. The trial court also addressed the prospect of serving the sentences consecutively, explaining that defendant "would first have to

complete one sentence before [she] would begin to start the next sentence." The trial court discussed its discretion to impose consecutive or concurrent sentences and fines.

¶ 8    On January 28, 2013, a jury trial commenced. The parties presented opening statements and during defendant's opening statement defense counsel indicated that McMeekin's accomplice was not defendant but rather was one of defendant's daughters. The State presented evidence from Rick reflecting that he and defendant were married in 1985 and had two children: Amber, born in June 1985, and Robin, born in December 1988. The marriage was dissolved in 1996, and the two children resided primarily with Rick in Libertyville. Defendant, who also lived in Libertyville, had regular visitation.

¶ 9    In June 1998, Rick married Angela. Rick and Angela lived in a two-story townhouse in Lincolnshire; the townhouse also had a basement. There was an emergency-exit window well in the basement bedroom. The window well was approximately four feet deep and covered by a metal grate on the backyard deck. Another emergency-exit window well was in a furnace area next to the bedroom. There were two entrances on the first floor. The front door faced the street, and a sliding glass door led from the family room to the backyard deck. The second floor had a master bedroom and bathroom suite, two more bedrooms, and one more bathroom. The stairs to the second floor led to a landing that faced the master bedroom.

¶ 10    Shortly after Rick and Angela married, Amber and Robin began residing with defendant; Rick had regular visitation and paid child support. Robin's testimony reflected that, in 2002, McMeekin moved into defendant's house; his family had temporarily moved to California. McMeekin was 15 to 16 years of age and was in a relationship with Robin, who was approximately 12 to 13 years of age. Defendant allowed McMeekin and Robin to share a bedroom, and they slept in the same bed. McMeekin continued to reside in defendant's home

even after his family returned from California. In February 2003, Amber decided to reside with Rick and Angela. Amber told Rick that defendant was allowing McMeekin to sleep with Robin. In March 2003, Rick obtained a court order granting him primary custody of Amber and Robin. The order prohibited defendant from allowing Robin to have contact with McMeekin and also terminated Rick's child support payments. Pursuant to the court order, Robin went to live with Rick and Angela.

¶ 11 The State's witnesses included Sergeant James Hanley of the Lincolnshire police department. Hanley testified that, on May 19, 2003, in the early morning hours, he was on duty with Officer Volstad. At approximately 5 a.m., they were dispatched to investigate a report of someone in a house. As he approached the back door of Rick and Angela's house, he could hear yelling and screaming inside. When Hanley stepped inside, "immediately a young girl came running down the stairs yelling and screaming hysterically"; the "young girl" was later identified as Robin. As Hanley made his way upstairs to the master bedroom, he "could clearly see two people laying in bed, a female to the right facing a male to the left and they were laying in bed motionless covered in blood."

¶ 12 Hanley described the layout of the townhouse and identified the locations where he observed blood spatter. Hanley called for an ambulance and additional police units; he also directed Volstad to take the children to a neighbor's house, clear the townhouse, and make everything safe. Paramedics transported Rick and Angela to the hospital, and Hanley stayed at the scene. On cross-examination, Hanley testified that he did not observe any blood on Robin as she came down the stairs.

¶ 13 John McReynolds, a firefighter and paramedic with the LaGrange fire department, testified regarding his treatment of the victims at the scene. Matthew Flanagan, a physician,

testified regarding the rehabilitation consultation he provided to the hospital staff for Rick. Scott Vaughn, formerly a firefighter and paramedic with the Lincolnshire/Riverwoods fire department, testified regarding his treatment of the victims at the scene. He observed Rick's head injuries and described them as life threatening; he transported Rick to the hospital. Jeremy Ziebka, a firefighter and paramedic with the Deerfield-Bannockburn fire protection district, provided substantively similar testimony regarding his treatment of Rick at the scene.

¶ 14 Brad Page, a deputy with the Lake County sheriff's department, testified regarding his assignment as an evidence technician. He took photographs of the crime scene. On cross-examination, Page could not recall observing blood evidence anywhere other than in the master bedroom. Frank Vicari, a pediatric plastic surgeon, testified regarding his treatment of Angela's craniofacial injuries. David Thomas, a patrol officer with the Village of Lake Bluff police department, testified regarding his duties as an evidence technician. Thomas videotaped the crime scene, and the tape was played for the jury. Jack Raby, a police officer with the Village of Vernon Hills at the time of the incident, testified regarding his assignment to process the scene.

¶ 15 Rick testified next. Rick met McMeekin only once. Rick forbade Robin from having contact with McMeekin, even by telephone. Rick learned, however, that defendant allowed Robin and McMeekin to sleep together at defendant's residence when defendant had visitation. Rick also secretly recorded Robin's phone calls, so he knew that Robin was talking to and meeting with McMeekin.

¶ 16 Rick was out of town during the week prior to the incident and returned home on Friday, May 16, 2003. While Rick was out of town, Angela overheard Robin talking to McMeekin on the phone. When Rick returned home, Angela told him what she overheard, which made Rick

angry. Rick telephoned his attorney and asked for a petition seeking to hold defendant in contempt for violating the custody order. Rick also called defendant and told her of his plans.

¶ 17 On May 18, 2003, at approximately 11:30 p.m., Rick went to bed. In the middle of the night, he woke up to hear Angela screaming. He observed Angela fall to the floor, and he observed a male standing in the master bedroom doorway. Rick struggled with the intruder. At this point in Rick's testimony, defense counsel requested a sidebar to inform the trial court that Rick's version of events had not been disclosed to her. The trial court commented, "[w]ell, we are dealing right now *** with a small segment of testimony. I find that the defense is not prejudiced by the supposed identification that is going to take place here of this person. I'm going to permit the testimony to go on." The trial court cautioned, though, if testimony comes out "about now being able to identify anybody else that is in the background, *** we're going to have him examined in open court so that [defense counsel] knows what she's facing, but I will reserve any issue of letting in this additional information as to whether or not the State had a duty to disclose this *** because I don't find at least the main thrust of it that there would be an identification to be prejudicial to the defense." The trial court indicated that, if Rick's testimony "goes differently," then defense counsel would be allowed to file a motion.

¶ 18 Rick's testimony continued. Rick threw the man to the floor in an area between the bed and a couch and was able to get on top of the man. Rick recalled seeing the man's face but not knowing who it was. Rick identified McMeekin as the man. Rick testified that, just as he felt in control of the struggle, he was struck in the back of his head, but not by McMeekin. Rick was not aware of anyone in the room other than him, Angela, and McMeekin. Rick recalled being hit in the head six to eight times. McMeekin was then able to get up, leaving Rick on the floor.

Rick added that, after he was hit, he lost the feeling in his arms and legs, but he could still hear everything. His next memory was of waking up in the hospital.

¶ 19   Rick testified that initially he had trouble remembering what took place. He knew that there were two people involved in the incident; at the time, he believed that it was McMeekin and McMeekin's brother, Michael. Rick testified that his memory of the incident began gradually returning over a period of years.

¶ 20   Rick testified that, at the time of the incident, his estate was worth approximately $2 million. Rick testified that, had he died, Angela would have inherited his estate; had he and Angela both died, his estate would have been divided evenly among the four children.

¶ 21   On cross-examination, Rick admitted that he had set up a recording system on his home telephone. He admitted that, in the weeks prior to the attack, he and Robin had disagreements about her seeing McMeekin.

¶ 22   On redirect, Rick testified further regarding his recollection of the events. Rick testified that he recalled fighting with McMeekin and that he had a recollection of "a woman sitting on my back yelling and swearing at me." Defense counsel asked for a sidebar and informed the trial court that she had never received that disclosure. The State indicated that it had never heard it either. The trial court instructed the jury to disregard that part of Rick's testimony, and the trial court struck the statements from evidence.

¶ 23   On recross-examination, Rick admitted that he never told the police about having a physical fight with McMeekin on May 19, 2003. Rick admitted that he was saying it for the first time in court.

¶ 24   During a *voir dire* hearing, held outside the presence of the jury, the trial court instructed Rick to return for more questioning regarding his recollection of the woman on his back. Rick

testified that he heard the woman's voice and recognized it as defendant's. On cross-examination, Rick testified that he relayed this information to the State's Attorney's office a couple of months prior to the date of the trial. When questioned by the trial court, Rick clarified his testimony and said that he believed he probably told the State's Attorney's office of the information, because it would have been important at the time. When questioned by the trial court, the assistant State's Attorneys indicated that Rick did not mention anything about a woman on his back or recognizing her voice. Defense counsel told the trial court that she was surprised to learn that Rick had recovered his memory of the incident. She also indicated that Rick's version of events was completely new to her.

¶ 25    The trial court found that Rick had not informed the State prior to trial that he could recall a woman being on his back during the incident. The trial court noted that the testimony "cuts both ways because it supports the Defendant's theory and it supports the State's theory." Nevertheless, the trial court barred the testimony from being used by either the State or the defense. The trial court also found that the State committed a discovery violation, but not deliberately, by not disclosing that Rick would be able to testify about the details of his scuffle with McMeekin. The trial court stated, "As a sanction for the State's inadvertent violation, I'm going to prohibit the State from arguing in any way the version of the scuffle that Mr. Rogers has." The trial court presumed that the jury would abide by the instruction to disregard that portion of Rick's testimony.

¶ 26    Robin testified that, whenever she was upset with her dad, she would "rant about how much *** I hated my dad, things like that." Robin added, though, that she never acted on her feelings. Robin testified that, on May 18, 2003, she went to bed between 11 and 11:30 p.m.; her bedroom door was closed. Shortly before 5 a.m., she awoke when she heard a "thud and some

smaller crashes and what sounded like people talking or possibly yelling." She got out of bed and walked down the hallway toward the stairs to the first floor. She did not hear any screams, cries for help, or footsteps going down the stairs. When Robin got to the master bedroom door, she saw that the door was open and a light was on. Her father was naked and lying face-down on the floor alongside the bed. Robin returned to her bedroom and closed the door.

¶ 27 Right after going back to bed, Robin began to hear more voices and determined that Angela was trying to scream for help. Robin got out of bed again and went into the master bedroom, where she saw Angela lying on the bed. Rick was in the process of getting back into the bed. He was stumbling and talking as if nothing had happened. Both Rick and Angela were covered in blood, and there was blood everywhere in the master bedroom. At approximately 5 a.m., Robin called 911 and reported that Rick and Angela were injured and that an intruder might still be in the home. A recording of the call was played for the jury.

¶ 28 On the day of the incident, Robin saw defendant at the Lincolnshire police station. Defendant told Robin that she had nothing to do with the incident. Robin denied attacking Rick or Angela or participating in the attack. Robin denied asking McMeekin or defendant to attack them.

¶ 29 On cross-examination, Robin gave to the police a statement indicating that she first awoke at 4:57 a.m. When asked if her statement indicated that she got up for the second time at 5:19 a.m., Robin answered, "probably, according to my alarm clock." Robin admitted that part of her statement might have been inaccurate. In late April or early May 2003, McMeekin asked Robin if she wanted someone to "take care of" Rick; she told him no. Robin admitted giving McMeekin the location of Rick and Angela's townhouse and giving him a specific description of its layout. Robin expressed in her letters and poems that she hated Rick, writing that she wished

Rick would die and that, if she could kill just one person, it would be Rick. Robin also wrote that she did not love either of her parents.

¶ 30 Approximately one week prior to the incident, Robin got into an argument with Rick. She was on the phone with a friend when the argument occurred; the friend overheard the argument. While on the phone, Robin expressed how much she hated Rick and asked her friend to kill Rick, although she claimed that she was just upset and venting. Robin admitted that she probably had a second argument with Rick in the days leading up to the incident.

¶ 31 Amber testified next. After she went back to living with her dad, she slept in the basement bedroom of the townhouse. Angela testified also. Angela recalled that, on May 18, 2003, she put her two sons to bed. Then, at approximately 9:30 p.m., she went to bed. She testified that she had no memory of the incident. Angela testified regarding her injuries and the surgeries she underwent.

¶ 32 Michael McMeekin testified that he met Rick only once, with his brother, and never met Angela. Michael denied going to Lincolnshire with his brother to hurt Rick and Angela.

¶ 33 At this point in the proceedings, the parties and the trial court engaged in a discussion outside the presence of the jury. The trial court wanted to address the issue of McMeekin's negotiated plea before he testified. They discussed the type of plea and a proffer agreement. Defense counsel represented that she and defendant preferred that no terms be given to the jury. The trial court noted that the decision was "a matter of strategy" and asked defendant specifically whether she agreed; defendant responded affirmatively.

¶ 34 McMeekin testified regarding his plea; he pleaded guilty on July 17, 2003, to two counts of attempted murder, of Rick and Angela. McMeekin testified regarding his relationship with Robin and his relationship with defendant. With respect to defendant, McMeekin testified that

they were friends and that defendant was motherly in that she took care of him. In the fall of 2002, though, their relationship changed and they began having sexual relations. Defendant talked to him about Rick's financial status and said that he had a lot of money. Defendant told McMeekin that, if Rick died, she would have to share his estate with Angela. If both Rick and Angela died, she would inherit Rick's entire estate and get custody of Robin and Amber, as well as Rick and Angela's two children. McMeekin had never met Angela.

¶ 35    McMeekin recalled that, sometime in April 2003, defendant drove him to Rick and Angela's townhouse. He said that Robin never told him she wanted Rick or Angela killed. On May 16, 2003, defendant and McMeekin had a conversation at defendant's apartment. Defendant expressed that she was worried about losing custody of Robin and Amber permanently and about being arrested for allowing McMeekin to have contact with Robin.

¶ 36    McMeekin testified that he smoked marijuana by himself three times on the evening of Sunday, May 18, 2003. Defendant had purchased the marijuana for him. At approximately 1 or 1:30 a.m. on May 19, McMeekin was with defendant in her apartment; McMeekin drank some beer. Defendant began talking about not wanting to be arrested and told McMeekin that she wanted to kill Rick. She wanted McMeekin to help her, but McMeekin said that he did not want to do that. Defendant then told McMeekin that he "owed her." She reminded McMeekin that she had bought things for him, taken care of him, and let him stay in her apartment. McMeekin replied that he still did not want to help defendant kill Rick, but defendant told him that, if he refused to help, she would tell Robin about their sexual encounters. McMeekin did not want Robin to learn about them, because he was in a relationship with her and did not want to hurt her, so he went along with defendant's plan.

¶ 37    McMeekin further testified that he and defendant took defendant's vehicle to Rick and Angela's residence.  McMeekin felt "stoned" and "a little buzzed."  Defendant parked about a block away from the townhouse.  Defendant gave McMeekin a ski mask and told him to put it on, which he did.  Defendant put on a similar mask.  Defendant was wearing leather gloves and gave McMeekin latex gloves.  Defendant also retrieved a hammer from the car and tried to give it to McMeekin.  He refused to take it, so defendant carried the hammer to the townhouse.

¶ 38    McMeekin testified that, when they reached the townhouse, they first went onto the deck in the backyard.  Defendant tried to open the sliding door leading from the deck into the house, but she was unable to do so.  McMeekin stood behind some bushes in the yard while defendant walked around the residence.  Approximately 15 to 20 minutes later, McMeekin saw defendant go back onto the deck.  She put the hammer down by the sliding door.  McMeekin "went back to doing what [he] was doing," which he described as "[p]retty much staring off into space."  McMeekin eventually heard the sliding door being opened.  Defendant was inside the residence on the other side of the door.  She motioned for McMeekin to enter, and he did.  Defendant had picked up the hammer.

¶ 39    Once inside the residence, McMeekin and defendant went to the second floor, stopping on the landing at the top of the stairs.  The door to the master bedroom was closed.  When defendant tried to open that door, it made a "creaking noise."  McMeekin then heard a woman's voice coming from inside the room.  Defendant opened the door farther, and McMeekin heard footsteps approaching the door.  The woman in the room asked, "What's going on?"  At the same time, the woman—whom McMeekin identified as Angela—pulled the door open all the way and also turned on a bedroom light.  McMeekin moved toward Angela, who was backing up.  He picked up Angela and threw her to the floor.

¶ 40    McMeekin testified that Rick then jumped up and started screaming.  He was saying, "You motherfucker, you motherfucker."  Rick jumped on top of McMeekin, and the two began grappling.  McMeekin's mask came off during the struggle.  McMeekin and Rick fell onto a couch.  Rick put his arm around McMeekin's neck and began choking him.  McMeekin was then face down on the couch.  He began "seeing spots," and then McMeekin felt a "thump" go through Rick's body.  Rick rolled off of him and onto the floor.  McMeekin saw defendant kneeling over Rick and repeatedly striking him in the head with the hammer.  With each blow, defendant said, "you bastard."  McMeekin recalled at least four blows, and then he took the hammer from defendant and ran.

¶ 41    He ran down the stairs, exited through the sliding door, and ran past defendant's car.  When he reached a "woodsy" area, he threw the hammer into a creek.  He then ran to a nearby lake, where he took off his ski mask, his shirt, his pants, his shoes, and one sock.  After putting his shoes back on, he ran back to where defendant's car had been parked.  The car was gone, but defendant drove up in the car and he got in.  Defendant asked him where his clothes were, and he told her where he had left them.

¶ 42    Defendant drove McMeekin back to her apartment, where he showered and put on fresh clothes.  Defendant gave McMeekin a towel and some type of cleaner.  At defendant's request, he went out to "wipe the car down."  When he went back to defendant's apartment, she was taking a shower.  McMeekin went to his apartment and slept.

¶ 43    At approximately 6 a.m., defendant went to McMeekin's apartment and woke him up, something she did not usually do.  Defendant told McMeekin, "no matter what, it's always no."  Defendant was already dressed for work, even though she normally did not leave for work until 7 a.m.  McMeekin went to school later that day.  While he was at school, the police came and took

him into custody. That same day, McMeekin not only provided the police with three signed statements, but he also led the police to the locations where he had disposed of the hammer and his clothes. The police found the hammer where McMeekin said he had left it, but his clothes were never found.

¶ 44    McMeekin gave the police three written statements, in which he admitted his involvement. McMeekin admitted signing all three statements, and all three were admitted into evidence at trial. In the first two signed statements, McMeekin did not implicate defendant; he did not want defendant "to get in trouble." In his third statement, he indicated that defendant had asked him to kill Rick and Angela, but he added that defendant never told him how she wanted him to do that.

¶ 45    The first two statements reflected that McMeekin entered and exited the townhouse through the sliding glass door in the back of the residence. In his third statement, McMeekin said that he exited through the sliding glass door but entered through the basement window that led to the bedroom. At trial, McMeekin testified that the police had told him they knew he had entered through the basement window and that he went along with what they said.

¶ 46    All three of McMeekin's signed statements indicated that he used a hammer to attack Rick and Angela and that he disposed of the hammer near the scene immediately after the incident. All three statements further indicated that he also removed his clothes immediately after the incident and left them somewhere near the scene.

¶ 47    McMeekin further testified that on July 8, 2003, he made a fourth statement, which he gave to two prosecutors. A police officer and McMeekin's lawyers were also present. According to McMeekin's testimony, all three of the signed statements he gave to the police on the day of the incident were false and he gave the fourth statement because he wanted to tell the

truth. McMeekin admitted, however, that his fourth statement was not entirely true. The statement reflected that he had sexual relations with defendant only once, but they actually had sex many times.

¶ 48 On cross-examination, McMeekin acknowledged that he entered a guilty plea less than two weeks after he made his fourth statement. He pleaded guilty to two counts of attempted murder, in exchange for the dismissal of four home-invasion charges and a sentencing cap of 35 years. McMeekin knew that, absent the plea agreement, he faced a maximum sentence of 60 years on the attempted-murder charges. He also knew that his plea agreement required him to provide truthful testimony at defendant's trial. McMeekin denied that the State had made any promises or proposed any plea agreement before he gave his fourth statement. McMeekin testified that he was serving the sentence he received after pleading guilty.

¶ 49 Marlette Simms, who worked in corrections in the Lake County sheriff's department, testified that in 2003 or 2004 she came into contact with defendant in the housing unit. Defendant asked her if she knew McMeekin, and Simms replied that she did. Defendant asked Simms to say hello to McMeekin and tell him that she loved him. Simms saw McMeekin approximately three weeks later and relayed the message. Simms acknowledged that she was reprimanded for the communication.

¶ 50 The State next presented five stipulations, which were published to the jury. The State's next witness was Jesus Gonzalez, a detective with the Village of Gurnee police department. On May 19, 2003, he contacted defendant at her place of work. Gonzalez indicated that the police were investigating an incident in which Rick and Angela had been hurt inside their residence. Defendant agreed to go to the Lincolnshire police department the same day. Defendant denied knowing anything about the attack on Rick and Angela. Defendant did not ask the police about

the condition of either Rick or Angela, about the condition of her daughters, or about their whereabouts.

¶ 51    Defendant gave four statements to the police on May 19.   She initially said that McMeekin had come to her apartment around 9 or 9:30 p.m. on May 18, but she later said that he arrived around midnight.   She also said that she provided McMeekin with some fresh clothes. Defendant thought that McMeekin was drunk or high, so she urged him to stay at her apartment instead of going home.   Defendant acknowledged that McMeekin was not in her apartment when she awoke at 4:15 a.m.   Defendant told the police that she took some trash out to the dumpster at 5 or 5:15 a.m.; it was her habit to wake McMeekin up for school; she woke him up that day sometime between 6 and 6:40 a.m.; he took a shower in her apartment; and she left for work around 7 or 7:15 a.m. as was her custom.   Defendant gave the police consent to search both her apartment and her vehicle.

¶ 52    The State's final witness was Andrew Jones, a detective with the Village of Vernon Hills police department.   Jones interviewed defendant on May 20, 2003.   Jones asked her to define her relationship with McMeekin, and defendant told him that they were not very close.   Defendant denied knowing that McMeekin was having sexual intercourse with Robin.   Defendant denied that she and McMeekin had a sexual relationship.   Defendant denied telling McMeekin to kill Rick but admitted telling McMeekin on May 16 that she wanted Rick to die and wanted to watch him suffer.   Defendant was upset and afraid of losing her daughters when she made those comments.

¶ 53    Jones further testified that, during the May 20 interview, defendant said that she and McMeekin had talked about Rick on May 18 or 19, when McMeekin arrived at her apartment at midnight.   Later McMeekin took her car keys, left the apartment alone, and did not return until

approximately 4 a.m. McMeekin was dressed but was carrying some clothes. He showered at defendant's apartment and then fell asleep on her sofa until she woke him up for school. Defendant denied that anyone cleaned her car on the morning of May 19, and she said that she went to work at her normal time.

¶ 54    In July 2003, after McMeekin made his fourth statement, a warrant was issued for defendant's arrest. Jones testified that he attempted to speak with defendant again but that she had since moved. Jones later learned that she was having unemployment checks sent to Milwaukee. On July 23, 2003, defendant was arrested in Milwaukee, where she was living with her brother. Defendant knew that Jones was trying to locate her, but she did not return his calls because the incident had been very hard on her and she did not want to be part of it. Defendant moved shortly after McMeekin's arrest. After moving, she spoke with Amber by telephone but never said where she was living.

¶ 55    Jones testified that defendant told him that she had sexual intercourse with McMeekin only once, sometime prior to the incident. Jones read part of McMeekin's fourth statement to defendant, including the portion in which he claimed that she had repeatedly hit Rick with the hammer. Defendant did not "offer any denial to the hammer part," but she claimed that she had been at her apartment when the attack occurred. Defendant admitted that she had told McMeekin on May 16 that Rick needed to be "taken off the fucking planet right now" and that "someone had to kill him now," but she said that this was just a fit of hysteria. Defendant described McMeekin as being "simple enough" to think that her ranting was serious and that she wanted him to kill Rick.

¶ 56    Defendant again said that McMeekin was not in her apartment when she awoke at 4 a.m. on May 19; she went to his apartment later and woke him up for school as she typically did, and

then she went to work. Defendant denied to Jones that she told anyone about how much she would inherit if Rick died. Defendant was unsure how much she would inherit.

¶ 57 Jones testified that defendant never indicated that McMeekin was lying or that his fourth statement was false, but she never admitted that she had participated in the attack. Defendant did admit that she had once shown McMeekin where Rick and Angela lived.

¶ 58 The State rested, and defendant called Daniel Thomas, an investigator for the Illinois State Police. Thomas testified regarding an impeachment matter pertaining to Amber. Defendant rested.

¶ 59 The State presented its closing argument. In arguing about matters of common sense, the State told the jury that McMeekin had "nothing to gain by lying, and it's the only time, members of the jury, that he needed to take an oath to tell you about what happened." Further discussing McMeekin's testimony, the State argued that the evidence proved that McMeekin's first signed statement to the police, which, according to the State, constituted his saying "I did everything, I did everything," was "not true." With respect to McMeekin's first statement to the police, the State argued:

"Well, we know that that's not true because he's wrestling with Rick on the floor and Rick, Rick testifies he's wrestling with [McMeekin] on the floor. [McMeekin] testifies he's wrestling with Rick on the floor. Rick's got him. He can't breathe and all of a sudden womp, he feels a thump through Rick's body and Rick rolls off. It can't be [McMeekin]. We know someone else is in that bedroom. It's impossible."

¶ 60 In rebuttal argument, the State compared the physical sizes of defendant and McMeekin and argued that it was defendant, and not McMeekin, who gained entry to the house through the basement window. The State continued with its argument:

"We know that there were two people in the room that night. We know that one person—that Rick had *** McMeekin, and how do we know that he had *** McMeekin? What corroboration of that is there? You can look at the picture of the scratches on *** McMeekin's neck. Consistent, consistent with what he told you and what Rick said. Then Rick is all of a sudden is hit in the head and where is—where the doctor testified that the injury was, one of the injuries was to Rick? To the back of the head. And then it was after that that he fell off and went to the ground and then that's when the Defendant grabbed that hammer and struck him over and over and over again, so [McMeekin] grabbed the hammer and ran out of the room, and, again he said exactly what he did."

¶ 61     At the State's request, but without any objection, the trial court instructed the jury that a witness's prior inconsistent statement could be used not only to impeach the witness, but also as substantive evidence, provided that the statement "narrates, describes, or explains an event or condition the witness had personal knowledge of, and the statement was written or signed by the witness or the witness acknowledged under oath that he or she made the statement." The trial court further instructed the jury that the testimony of a witness who admits having participated in the crime "is subject to suspicion," that such testimony should be considered "with caution," and that it should be "carefully examined in light of the other evidence in this case."

¶ 62     Following deliberations, the jury found defendant guilty on each count alleged in the indictment.

¶ 63     Defendant filed a posttrial motion, which the trial court denied after a hearing on March 14, 2013. The trial court imposed the following sentence: a 15-year term on the solicitation-of-murder count; a consecutive 22-year term on the conviction of the attempted murder of Rick; and

a consecutive 24-year term on the conviction of the attempted murder of Angela. The trial court found that the home-invasion counts merged with the attempted-murder counts.

¶ 64    Following the trial court's April 2015 denial of defendant's motion to reconsider her sentence, defendant filed a timely notice of appeal.

¶ 65                                                    II. ANALYSIS

¶ 66    Defendant first contends that she was deprived of the right to the effective assistance of counsel at trial. In support of her contention, defendant argues that (1) defense counsel failed to establish that McMeekin could be prosecuted for perjury and could jeopardize his plea bargain if his testimony substantially deviated from his fourth statement, and (2) defense counsel failed to object when the State violated the trial court's order prohibiting it from relying on Rick's testimony describing the details of the attack. Defendant asserts that these two omissions by defense counsel harmed her by making McMeekin's testimony seem more credible and, when considered together, were sufficiently prejudicial to warrant relief.

¶ 67    Generally, claims of ineffective assistance of counsel are evaluated under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under *Strickland*, a defendant can prove ineffective assistance of counsel by establishing both of the following: (1) her counsel's "representation fell below an objective standard of reasonableness," and (2) absent that error, there is a reasonable probability that the trial's outcome would have been different. *Id.* at 688; *People v. Young*, 341 Ill. App. 3d 379, 383 (2003). Because a defendant must prove both prongs of the *Strickland* test to prevail, we may resolve an ineffective-assistance claim by finding that the defendant cannot prove one of the prongs, without deciding the other.

¶ 68    In showing deficient performance, "the defendant must overcome the 'strong presumption' that his counsel's representation fell within the 'wide range of reasonable

professional assistance.' " *People v. Franklin*, 135 Ill. 2d 78, 117 (1990) (quoting *Strickland*, 466 U.S. at 689). The sixth amendment requires, at a bare minimum, that defense counsel act as a true advocate for the accused. *United States v. Cronic*, 466 U.S. 648, 656 (1984). To demonstrate deficient performance, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 162 (2001). To demonstrate prejudice, "[t]he defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *People v. Bull*, 185 Ill. 2d 179, 203 (1998) (citing *People v. Griffin*, 178 Ill. 2d 65, 74 (1997)).

¶ 69    In certain situations, the two-part *Strickland* test need not be applied and prejudice may be presumed. See *Cronic*, 466 U.S. 648. Where " 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable.' " *People v. Hattery*, 109 Ill. 2d 449, 461 (1985) (quoting *Cronic*, 466 U.S. at 659). Thus, if a concession of guilt is made by defense counsel, as was done in *Hattery*, "ineffectiveness may be established; however, the defendant faces a high burden before he can forsake the two-part *Strickland* test." *People v. Johnson*, 128 Ill. 2d 253, 269-70 (1989). The circumstances of the present case do not establish a failure to subject the State's case to meaningful adversarial testing, and therefore defendant has not met that high burden and prejudice may not be presumed.

¶ 70    Accordingly, we look at the specific instances of error that defendant claims demonstrate that her counsel was ineffective. Defendant notes that McMeekin gave four statements to the authorities. The first three were reduced to writing and signed by McMeekin and were given to the police on the day of the incident. The fourth statement was made orally to a team of prosecutors after McMeekin had spent nearly two months in jail. Defendant asserts that,

although McMeekin's testimony left the jury with the impression that his fourth statement was the truth, his statement was misleading because of the proffer agreement. The proffer agreement reflected that McMeekin could be prosecuted for perjury if he provided testimony inconsistent with his fourth statement. Defendant argues that defense counsel was ineffective for failing to exploit the circumstances of McMeekin's fourth statement and the proffer agreement.

¶ 71    Decisions such as what evidence to present, whether to call a certain witness, and what theory of defense to pursue are matters of trial strategy. *People v. Enis*, 194 Ill. 2d 361, 381 (2000). "Matters of trial strategy are generally immune from claims of ineffective assistance of counsel." *People v. Smith*, 195 Ill. 2d 179, 188 (2000). While the cross-examination of a witness is a matter of trial strategy, the failure to use significant impeaching evidence against an important witness is deficient representation. *People v. Salgado*, 263 Ill. App. 3d 238, 247 (1994). A defendant may overcome the deferential view that the challenged action or inaction of counsel was a matter of sound trial strategy by showing that counsel's decision was "so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82.

¶ 72    In the present case, defense counsel's decision whether and to what extent to challenge McMeekin regarding the proffer agreement and his fourth statement was discussed during trial, outside the presence of the jury. As reflected above, the trial court wanted to address the issue of McMeekin's negotiated plea before he testified. The trial court, the State, and defense counsel discussed the type of plea and the proffer agreement. Defense counsel represented that she and defendant preferred that no terms be given to the jury. The trial court noted that the decision was "a matter of strategy" and asked defendant specifically whether she agreed; defendant responded affirmatively. Defense counsel's decision was part of a reasonable trial strategy to exploit the

inconsistencies in McMeekin's statements, to challenge McMeekin's credibility, and to emphasize his relationship with Robin, in an effort to create reasonable doubt as to defendant's guilt. Further, the record shows that defense counsel executed that strategy, thoroughly impeaching McMeekin. There is no reasonable probability that using the proffer agreement for additional impeachment would have led to a different outcome.

¶ 73 Defendant's other claimed instance of ineffectiveness concerns defense counsel's failure to object during the State's closing argument. Defendant takes issue with defense counsel's failure to object when the State argued that McMeekin's first signed statement was "not true"; when the State argued that both McMeekin and Rick testified that they had wrestled on the master bedroom floor; and when the State argued in rebuttal that the jury should find that there were two attackers because that was "consistent" with McMeekin's testimony and with "what Rick said." Defendant argues that the comments contravened the trial court's order expressly prohibiting the State from "arguing in any way the version of the scuffle" that Rick had provided.

¶ 74 A prosecutor is allowed wide latitude during closing arguments. *People v. Nieves*, 193 Ill. 2d 513, 532-33 (2000). A prosecutor may comment on the evidence presented at trial, as well as any fair, reasonable inferences therefrom, even if such inferences reflect negatively on the defendant. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). Generally, it is improper for the prosecutor to vouch for the credibility of a witness, express a personal opinion on a case, or place the integrity of the State's Attorney's office behind a witness's testimony. *People v. Emerson*, 122 Ill. 2d 411, 434 (1987). But, the State may discuss witness credibility and is entitled to assume the truth of the State's evidence. *People v. Pryor*, 170 Ill. App. 3d 262, 273 (1988). The

comments are to be considered as a whole, in the context of the parties' arguments. *People v. Buss*, 187 Ill. 2d 144, 244 (1999).

¶ 75 In the present case, the trial court orally informed the jury shortly before closing arguments commenced that they were not evidence. We have reviewed the State's closing argument and its rebuttal argument in their entirety, and, contrary to defendant's argument on appeal, we do not believe that the complained-of comments and defense counsel's failure to object to them deprived defendant of a fair trial or constituted such a factor that the jury likely would have reached a different verdict had there been an objection. For example, the State's argument that McMeekin's first statement was "not true" was a comment made during the State's review of McMeekin's four statements to the police and, when placed in the proper context, did not place the integrity of the State's Attorney's office in the position of determining the truth of the matter.

¶ 76 Defense counsel's strategy was reasonable despite its ultimate lack of success. See *People v. Szabo*, 144 Ill. 2d 525, 531 (1991) (noting that merely losing a case does not indicate ineffective assistance of counsel). The record as a whole satisfies us that the State's case was subjected to meaningful adversarial testing. Considering the totality of defense counsel's conduct, we note that counsel competently defended this case.

¶ 77 To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. We conclude that defendant fails the prejudice prong of the *Strickland* test. Counsel's allegedly deficient performance did not render the result of the trial unreliable or the proceeding fundamentally unfair. See *Griffin*, 178 Ill. 2d at 74. Even if

defense counsel had subjected McMeekin's testimony to more adversarial testing and had objected during the State's closing and rebuttal arguments, we conclude that there is no reasonable probability that the result of the trial would have been different. Accordingly, defendant has failed to carry her burden under the second prong of *Strickland*.

¶ 78 Defendant also contends that, even if the errors claimed do not individually warrant a new trial, the cumulative effect of them does. "Individual trial errors may have the cumulative effect of denying a defendant a fair trial." *People v. Hall*, 194 Ill. 2d 305, 350 (2000). Here, however, we have rejected defendant's claims of error with respect to defense counsel's failures to exploit McMeekin's fourth statement and the proffer agreement and to object during the State's closing and rebuttal arguments. Accordingly, defendant's request for a new trial on the basis of cumulative error is without merit.

¶ 79 Defendant next contends that the trial court was statutorily prohibited from imposing consecutive prison terms of 24 years and 22 years on the attempted-murder counts, where the trial court had previously imposed consecutive terms of 18 years and 12 years on those counts pursuant to a negotiated guilty plea.

¶ 80 As a preliminary matter, defendant acknowledges that she failed to include this issue in her motion to reconsider her sentence, but she argues that this issue is not forfeited, because a challenge to a sentence that is imposed in violation of a statute may be raised at any time. See *People v. Strawbridge*, 404 Ill. App. 3d 460, 470 (2010). Generally, a defendant forfeits sentencing issues when she does not object at the sentencing hearing or include them in a written motion to reconsider the sentence. *People v. Moore*, 365 Ill. App. 3d 53, 67 (2006). However, a sentence that does not comport with applicable statutory guidelines is beyond the power of a trial court and, therefore, void. *Strawbridge*, 404 Ill. App. 3d at 470. A void sentence may be

challenged at any time. *Id.* Moreover, "[t]he imposition of an unauthorized sentence affects substantial rights and *** plain error review extends to such matters." (Internal quotation marks omitted.) *Id.* (quoting *People v. Calhoun*, 377 Ill. App. 3d 662, 667 (2007)). Thus, because defendant argues that her new sentence violates the provisions of section 5-5-4 of the Unified Code of Corrections (730 ILCS 5/5-5-4 (West 2010)), we will review this issue.

¶ 81    Section 5-5-4(a) of the Unified Code of Corrections is titled "Resentences" and provides:

"Where a conviction or sentence has been set aside on direct review or on collateral attack, the court shall not impose a new sentence for the same offense or for a different offense based on the same conduct which is more severe than the prior sentence less the portion of the prior sentence previously satisfied[,] unless the more severe sentence is based upon conduct on the part of the defendant occurring after the original sentencing." *Id.*

¶ 82    The Council Commentary to section 5-5-4 provides, "[This section] [l]imits the use of increased sentences where an original conviction or sentence has been overturned by a higher court" and "This section sets out the rule adopted by the United States Supreme Court in North Carolina v. Pearce, 395 U.S. 711 *** (1969) and followed by Illinois in People v. Baze, 43 Ill. 2d 298 *** (1969)." 730 ILCS Ann. 5/5-5-4, Council Commentary-1973, at 678 (Smith-Hurd 1997). In the present case, defendant's withdrawal of her guilty plea was allowed by the trial court, and not by this court. As the reviewing court noted in *People v. Adams*, 169 Ill. App. 3d 312, 317 (1988), when a defendant's trial and subsequent conviction were the result of his or her own decision to withdraw a guilty plea, the defendant cannot claim the protection intended for those who attack their convictions on constitutional grounds by either direct review or collateral attack. After defendant challenged on appeal the trial court's summary dismissal of her

postconviction petition, this court held merely that defendant's postconviction petition set forth the gist of an ineffective-assistance claim and that therefore summary dismissal was improper. See *Rogers*, 372 Ill. App. 3d at 868. On remand, defendant and the State engaged in motion practice and discovery, and the trial court conducted an evidentiary hearing before determining that defendant should be entitled to postconviction relief. The trial court then allowed defendant to withdraw her guilty plea. Therefore, at first blush, it seems that section 5-5-4 does not apply to the circumstances of the present case. This is consistent with the decisions of other courts that have reviewed the applicability of section 5-5-4 and the council commentary to section 5-5-4. See, *e.g.*, *People v. Gorka*, 374 Ill. App. 3d 85 (2007); *People v. Pittman*, 316 Ill. App. 3d 245 (2000); *Adams*, 169 Ill. App. 3d 312. In *People v. Miller*, 286 Ill. App. 3d 297, 302 (1997), this court reached the same result under circumstances similar to those here and stated, "[s]ince in this case the defendant's guilty plea was vacated by the trial court, his conviction was not overturned by a higher court as required in order for section 5-5-4 to apply."

¶ 83 Rather than simply comparing the length of defendant's sentence as defendant would have us do, we must consider how the sentences were generated and determine whether the statute applies. In the first instance, defendant's sentence was the result of a fully negotiated plea; in the second, it followed a jury trial. With respect to the first instance, we recognize that plea agreements are governed to some extent by contract-law principles. *People v. Evans*, 174 Ill. 2d 320, 326 (1996) (citing *People v. Langston*, 125 Ill. App. 3d 479, 482 (1984)). In a fully negotiated plea, the plea and the sentence " 'go hand in hand' " as material elements of the plea bargain. *Id.* at 325. Since *Evans*, our supreme court has repeatedly held that it is the State's sentencing concession that triggers the application of contract principles. See, *e.g.*, *People v. Morris*, 236 Ill. 2d 345 (2010); *People v. Diaz*, 192 Ill. 2d 211 (2000) (contract principles apply

where the State agreed not to seek extended-term sentences); *People v. Linder*, 186 Ill. 2d 67 (1999) (contract principles apply where defendant pleaded guilty in exchange for a sentencing cap); *People v. Clark*, 183 Ill. 2d 261 (1998) (contract principles apply to a negotiated guilty plea, even when the parties disagreed on whether the sentences would be served consecutively).

¶ 84    The instant case is appropriate for the application of contract-law principles. As earlier noted, defendant and the State entered into a fully negotiated plea agreement in which defendant agreed to plead guilty to two attempted-murder charges and, in exchange, the State agreed to nol-pros the remaining charges; defendant and the State agreed to consecutive terms of 18 years' imprisonment on one count and 12 years' imprisonment on the second count. The trial court accepted the plea agreement and entered judgment thereon, thereby finalizing the agreement between defendant and the State.

¶ 85    Thereafter, when the trial court granted defendant's second amended postconviction petition, it vacated defendant's guilty plea and the accompanying sentence. Our supreme court addressed this consequence in *Diaz*, 192 Ill. 2d at 225, finding that, when a trial court grants a motion to withdraw a guilty plea, "both parties are then returned to the status quo as it existed prior to the acceptance of the plea." Hence, the trial court correctly reinstated all of the charges against defendant and ordered a trial on all of the charges. The trial court added, "[b]ecause of the relief being granted by [*sic*] the Defendant, it is this court's belief that we go back to the status at the time of the presentation of the plea; and all time begins running as of that particular date."

¶ 86    Once the parties were returned to the status quo existing prior to the acceptance of the fully negotiated guilty plea, neither side could later claim the benefit of the prior agreement. The record reflects that the trial court conducted an arraignment hearing, during which it read the

seven counts of the indictment to defendant and explained the possible sentences she could face if convicted. At this stage, the parties were free to prepare for trial or even enter into a new agreement.

¶ 87 The nomenclature of section 5-5-4 pertains to "resentencing." See 730 ILCS 5/5-5-4 (West 2010). Because the trial court vacated the guilty plea and the accompanying sentence, there was no sentence that was subject to "resentencing." See also *People v. Taylor*, 2015 IL 117267, ¶ 29 (noting that section 5-5-4 does not apply if the original sentence was determined to be void); *cf. People v. Donelson*, 2013 IL 113603, ¶ 29 (remanding with directions that the trial court resentence the defendant in accordance with both the plea agreement and the applicable statutes). Returning defendant here to the status quo existing prior to the acceptance of her guilty plea permitted the trial court to sentence defendant, following the jury's finding of guilt, to any term allowed by statute, including the sentence that defendant ultimately received. We determine that defendant's increased sentence following the withdrawal of her guilty plea does not violate section 5-5-4, as section 5-5-4 is not applicable.

¶ 88 Defendant relies on *Strawbridge*, 404 Ill. App. 3d 460. In *Strawbridge*, the defendant argued that, because he had previously been sentenced to 9 years' imprisonment on the first two counts of the indictment, it was beyond the power of the trial court to resentence him to 12 years' imprisonment "after this court vacated his earlier convictions on these counts and remanded for further proceedings." *Id.* at 470. Having so noted that we had vacated those convictions, we construed the plain language of section 5-5-4. See *id.* We agreed that the trial court would have erred in imposing a longer sentence, unless the increase had been based on conduct occurring after the first time the defendant was sentenced. *Id.* Because the State identified no subsequent

conduct to justify the longer sentence, this court reduced the sentence to nine years' imprisonment. *Id.* at 471.

¶ 89    If we were to read only *Strawbridge*, 404 Ill. App. 3d 460, we might be intrigued by defendant's argument.  However, the underlying circumstances of the defendant's initial plea agreement and subsequent challenge to the plea were not discussed in *Strawbridge*, 404 Ill. App. 3d 460.  Rather, the circumstances were presented in his first appeal, *People v. Strawbridge* (*Strawbridge I*), No. 2-01-1008 (2003) (unpublished order under Supreme Court Rule 23).  In *Strawbridge I*, the defendant and the State entered into an agreement whereby the defendant agreed to plead guilty to three offenses and, in exchange, the State agreed to nol-pros the remaining six offenses.  "There was no agreement about a sentence."  *Strawbridge I*, slip op. at 1.  Because the guilty plea and the sentence " 'go hand in hand' " as material elements of the plea bargain (*Evans*, 174 Ill. 2d at 325), and because the application of contract principles are triggered by the State's sentencing concession, neither of which were present in *Strawbridge I*, contract principles were never triggered and therefore did not apply when the defendant later challenged his harsher sentence in *Strawbridge*, 404 Ill. App. 3d 460.  Accord *People v. Lumzy*, 191 Ill. 2d 182, 187 (2000) (*Evans*'s contract principles do not apply where the agreement concerns only charges and not sentences).  We conclude that both *Strawbridge I* and *Strawbridge*, 404 Ill. App. 3d 460, are distinguishable from the present case and are inapplicable to our analysis.

¶ 90    Our supreme court has determined that to allow a defendant to unilaterally modify the terms of a fully negotiated plea agreement while holding the State to its part of the bargain "flies in the face of contract law principles."  *Evans*, 174 Ill. 2d at 327.  Here, defendant wishes to hold the State to its part of the initial bargain, even though she took a second chance with a jury trial,

thereby raising the specter of "gamesmanship" similar to that discussed in *Evans*. *Id.* Defendant's interpretation of section 5-5-4 and her accompanying analysis are at odds with the principle expressed in *Diaz*: when a trial court grants a motion to withdraw a guilty plea, 'both parties are then returned to the status quo as it existed prior to the acceptance of the plea." *Diaz*, 192 Ill. 2d at 225. Moreover, defendant's interpretation thwarts the purpose of plea agreements. See *People v. McCutcheon*, 68 Ill. 2d 101, 107 (1977) (" '[T]he guilty plea and the often concomitant plea bargain are important components of this country's criminal justice system. Properly administered, they can benefit all concerned. The defendant avoids extended pretrial incarceration and the anxieties and uncertainties of a trial; he gains a speedy disposition of his case \*\*\*. Judges and prosecutors conserve vital and scarce resources.' " (quoting *Blackledge v. Allison*, 431 U.S. 63, 71 (1977))). The implication of defendant's interpretation would be that every criminal defendant should enter into a plea agreement, only to withdraw it later and take a chance on a trial in the hopes of a lesser sentence, knowing that he or she would never receive a harsher sentence. Because section 5-5-4 is not applicable in this case, we reject defendant's interpretation and contention.

¶ 91                              III. CONCLUSION

¶ 92    For the reasons stated, we affirm the judgment of the circuit court of Lake County. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2014); see also *People v. Nicholls*, 71 Ill. 2d 166, 179 (1978).

¶ 93    Affirmed.