# Illinois Official Reports

## Appellate Court

---

### *People v. Custer*, 2020 IL App (4th) 180128

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARVON D. CUSTER, Defendant-Appellant. |
| District & No. | Fourth District<br>No. 4-18-0128 |
| Filed | February 28, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 17-CF-952; the Hon. Peter C. Cavanagh, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and John R. Breffeilh, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Daniel K. Wright, State's Attorney, of Springfield (Patrick Delfino, David J. Robinson, and Rosario David Escalera Jr., of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Justices Harris and Holder White concurred in the judgment and opinion. |

**OPINION**

¶ 1        In September 2017, the State charged defendant, Marvon D. Custer, with delivering a controlled substance to a confidential source (CS). 720 ILCS 570/401(d)(i) (West 2016).

¶ 2        Prior to defendant's jury trial, the parties agreed that the State would not introduce the CS's statements because he would not testify at trial. Springfield police officer Tammy Baehr testified at trial that she formed the plan to have the CS purchase heroin from defendant. Baehr further testified that she observed a hand-to-hand drug transaction between the CS and defendant, during which the CS obtained heroin in exchange for $50.

¶ 3        During closing arguments, the prosecutor argued in rebuttal that Baehr "didn't even know who the target was until she was informed by the [CS]." Defendant was ultimately convicted and sentenced to 7½ years in prison.

¶ 4        Defendant appeals, arguing that his trial counsel was ineffective because counsel failed to object during closing arguments to the prosecutor's statement that Baehr was informed of the identity of defendant by the CS. We disagree and affirm.

                              I. BACKGROUND
¶ 5
¶ 6                     A. The Charges and Pretrial Proceedings
¶ 7        In September 2017, the State charged defendant with delivering a controlled substance to a CS. *Id.* Prior to trial, the parties agreed that the State would not introduce the CS's statements because he would not be testifying at trial. Defense counsel discussed this matter with the trial court, as follows:

> "[Officer James Cordery], before the transaction went down, *** met with the confidential source, had a conversation with the [CS], sent the [CS] a picture, and at that point, the [CS] identified my client with a different name, and an officer became aware that it was [defendant].
>
> The State is not going to introduce evidence [of] that conversation, which I agree that they should not. I believe the State is going to say the officer familiarized himself by looking at a picture of [defendant] prior to the transaction, and I believe that's appropriate, but not anything about the conversation with the [CS] or prior criminal history, or so on, and I don't think that we are going to get into that, but we have agreed to that, and I think it's proper, so that's one of the things I wanted to make a record of."

¶ 8        The prosecutor essentially agreed with defense counsel's representations to the court, and both parties told the trial court they were clear as to what the agreement was.

                              B. The Jury Trial
¶ 9
¶ 10       At defendant's December 2017 jury trial, during the State's opening statement, the prosecutor said, "The controlled source met with individuals of the Pro-Active Crime Unit. *** Officer Cordery and Officer Baehr are involved initially with this case. They talk to the CS, and the CS tells them they can make a buy from an individual, [defendant]."

### 1. *Jeramie Mayes*

Springfield police officer Jeramie Mayes testified that on August 23, 2017, he was working with the Central Illinois Enforcement Group when he assisted Officers Baehr and Cordery in a narcotics investigation. Mayes, Baehr, and Cordery met at the 500 block of White City Boulevard (White City) in Springfield, IL.

Mayes testified that he and Cordery drove together and followed Baehr, who was undercover, to the front of an apartment building in the 500 block of White City. Mayes and Cordery were there to surveil the situation and to ensure the safety of Baehr and the CS who was with her. Mayes and Cordery waited in a parking lot south of the apartment building, and Mayes positioned the vehicle so that Cordery could see Baehr's vehicle. Mayes could not see any transaction that occurred at Baehr's vehicle.

### 2. *James Cordery*

Springfield police officer James Cordery testified that he was a member of the Pro-Active Crime Unit and was working in that capacity on August 23, 2017, when he met with officers Baehr and Mayes. Baehr told Cordery that the buyer was going to go to 507 White City.

Cordery also testified that his role was to be the cover officer for Baehr, meaning that she would drive the CS to 507 White City, and Cordery would protect Baehr and the CS and "keep them in sight and make sure that everything went okay during the deal." Prior to starting the operation, Baehr searched the CS to make sure he had no contraband on his person and had only the money the police gave him.

Cordery testified that no arrest was made that day because this case was an ongoing investigation and they did not want the suspect to know who the CS was. Cordery described what occurred as a "buy-walk," in which the CS buys the drugs but the police make no arrests so the investigation can continue, as opposed to a "buy-bust," in which, as soon as the police know the CS bought drugs from a dealer, the police immediately arrest the suspect dealer. Cordery further testified that the location of the transaction was determined by the person from whom the drugs were bought.

### 3. *Tammy Baehr*

Springfield police officer Tammy Baehr testified that she was a member of the Pro-Active Crime Unit and conducted narcotics investigations. She formed the plan to have the CS purchase heroin from defendant. In relevant part, Baehr testified regarding the planning of the purchase, as follows:

> "Q. And did you make contact with the CS?
>
> A. Yes, I did.
>
> Q. And the contact with the CS and the plan was formed through that CS to purchase heroin, is that correct?
>
> A. Yes, sir.
>
> Q. Is this plan kind of spur-of-the-moment, kind of fluid, or was there a lot of research that had been done in regards to this?
>
> A. I had done some research.

Q. But prior to where the location was going to be, was it fluid, or was there research done?

A. That was fluid.

Q. Did you have an idea of an individual that you may be looking for?

A. Yes.

Q. That you would be purchasing, or at least a purchase of controlled substance would be made?

A. Yes.

Q. To familiarize yourself with that individual, did you take a look at the photograph?

A. Yes, I did.

Q. At that point did you look at [defendant]?

A. Yes, I did."

¶ 20 Baehr testified that in August 2017, she met the CS at a secured location, searched him, and gave him $50. The CS then received a call, and they traveled to 507 White City in Baehr's unmarked police vehicle. Baehr had no input as to where the transaction would be made.

¶ 21 Baehr testified that after she and the CS arrived at a parking lot, they waited several minutes before defendant approached Baehr's vehicle. The CS then handed defendant $50, and in exchange, defendant gave the CS a small plastic bag containing heroin. Baehr testified that the dealer in the transaction was a black male, and she identified defendant in court as the person who sold the drugs on that day to the CS. To protect the CS's identity, Baehr did not arrest defendant immediately after the transaction.

¶ 22 Aaron Roemer, a forensic scientist with the Illinois State Police laboratory, testified that his test of the contents of the small plastic bag revealed that the contents (1) were heroin and acrylfentanyl and (2) weighed 0.1 gram.

¶ 23 The State then rested, and defendant did not present any evidence.

¶ 24 During the prosecutor's rebuttal closing argument, he spoke about Baehr's credibility and memory, saying, "[Baehr] said she looked at a picture. She didn't even know who the target was until she was informed by the CS. She takes a look at a picture to familiarize herself with what [defendant] looked like." Defense counsel did not object to these statements.

¶ 25 The jury convicted defendant of delivery of a controlled substance, and the trial court later sentenced him to 7½ years in prison.

¶ 26 This appeal followed.

¶ 27                                II. ANALYSIS

¶ 28 Defendant appeals, arguing only that his trial counsel was ineffective because counsel failed to object during closing arguments to the prosecutor's statement that Baehr was informed of defendant's identity by the CS. We disagree and affirm.

¶ 29              A. The Law Regarding Effective Assistance of Counsel

¶ 30 All criminal defendants enjoy the constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient

and that the deficient performance prejudiced the defendant." *People v. Domagala*, 2013 IL 113688, ¶ 36, 987 N.E.2d 767.

To show deficient performance, it is not sufficient for a defendant to show that counsel's representation was imperfect, because *Strickland* guarantees only a " 'reasonably competent attorney.' " (Internal quotation marks omitted.) *Harrington v. Richter*, 562 U.S. 86, 110 (2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Instead, a defendant must show that his counsel's representation " 'undermined the proper functioning of the adversarial process' " to the extent that the defendant was denied a fair trial. *Id.* (quoting *Strickland*, 466 U.S. at 686).

## B. The Law Regarding Reasonable Inferences

A prosecutor is allowed wide latitude during closing arguments and may comment on both the evidence presented at trial and any fair and reasonable inferences that can be drawn from that evidence. *People v. Rogers*, 2015 IL App (2d) 130412, ¶ 74, 49 N.E.3d 70. "[I]t is not error for the State to rely on properly admitted evidence or the inferences to be drawn from that evidence." *People v. Herring*, 2018 IL App (1st) 152067, ¶ 83, 123 N.E.3d 1.

In *People v. Hubner*, 2013 IL App (4th) 120137, ¶¶ 24-27, 986 N.E.2d 246, this court analyzed the law regarding reasonable inferences and wrote the following:

"[T]he *** issue [in this case] is whether the jury could reasonably draw certain inferences from the evidence before it. If a jury could do so, then no attorney—including the prosecutor—commits error by urging the jury to draw those inferences.

This rule of law is hardly new or novel. Over 100 years ago, the Supreme Court of Illinois addressed a defendant's claim that the prosecutor's closing argument was improper and wrote the following:

'It is not improper for a prosecuting attorney to reflect unfavorably on defendant or denounce his wickedness, and even indulge in invective, if based upon evidence competent and pertinent to be decided by the jury. *** Whatever is deducible from the testimony by direct proof[,] *or legitimate inference from facts that are proven*, and which bears upon the issue in a cause, must be a fair subject of comment by counsel, and if such deductions or inferences tend to fix upon a defendant the wickedness and crime that are charged against him, it must be within the scope of proper and fair argument to denounce him accordingly.' (Emphasis added.) *Crocker v. People*, 213 Ill. 287, 290-91, 72 N.E. 743, 744 (1904).

The supreme court repeated this point [63] years ago in *People v. Halteman*, 10 Ill. 2d 74, 83-84, 139 N.E.2d 286, 293 (1956), as follows: '[O]nly recently we reaffirmed our previous holdings to the effect that statements of counsel based upon the facts, or upon legitimate inferences deduced therefrom, do not transcend the bounds of debate and are not to be discountenanced by the courts.'

*** [I]n *People v. Dunlap*, 2011 IL App (4th) 100595, ¶ 29, 963 N.E.2d 394[, this court wrote the following]:

'Just as the jury is entitled to draw inferences from the evidence that are reasonable [citation], the attorneys—including the prosecutor—may argue those inferences. To the extent that the jury could reasonably infer certain facts, the prosecutor is justified in arguing them.'

Last, we note that this rule of law is even incorporated into the standard set of instructions given to the jury in all criminal cases. Specifically, Illinois Pattern Jury Instructions, Criminal, No. 1.03 reads, in pertinent part, as follows: 'Closing arguments are made by the attorneys to discuss the facts and circumstances in the case and should be confined to the evidence *and to reasonable inferences to be drawn from the evidence*.' (Emphasis added.) Illinois Pattern Jury Instructions, Criminal, No. 1.03 (4th ed. 2000)."

¶ 35 All of the cases discussed above can be distilled into the core principle that if a "jury could reasonably draw certain inferences from the evidence before it," "then no attorney—including the prosecutor—commits error by urging the jury to draw those inferences." *Id.* ¶ 24. This principle of law, which dates back at least 100 years, is the principle we now apply.

¶ 36                                              C. This Case

¶ 37 Defendant argues that his trial counsel was ineffective because he failed to object during closing arguments to the prosecutor's statement that Baehr was informed of defendant's identity by the CS. Specifically, in the prosecutor's rebuttal argument, he said the following: "[Baehr] said she looked at a picture. She didn't even know who the target was until she was informed by the CS. She takes a look at a picture to familiarize herself with what [defendant] looked like."

¶ 38 We conclude that defense counsel's performance was not deficient because the prosecutor's statement in question was completely appropriate. That statement was based upon an entirely reasonable inference drawn from the testimony the jury heard.

¶ 39 Baehr testified that she contacted the CS and they formed a plan to purchase drugs from defendant. To pursue this plan, the CS must have told Baehr that defendant was the target of the investigation. This inference becomes compelling in light of the next step that Baehr took in her investigation, which was that in order to familiarize herself with defendant, she looked at a photograph of him. That testimony shows that she did not know who defendant was before she spoke with the CS. Had Baehr originated the plan to buy drugs from defendant, her testimony about her need to look at a photograph of defendant to familiarize herself with him would make no sense.

¶ 40 We add that when, as here, counsel in closing argument asserts facts that are inferable from the evidence before the jury, counsel need not state that counsel's argument rests upon an inference. Accordingly, as in this case, counsel's argument about what the evidence shows (which is based upon a reasonable inference) is not objectionable because counsel failed to explicitly tell the jury counsel's argument relies on an inference. Closing arguments require no such annotations to be permissible.

¶ 41 Because the prosecutor's rebuttal argument was entirely appropriate, defense counsel could not have been ineffective for failing to object to it.

¶ 42                                            III. CONCLUSION

¶ 43 For the reasons stated, we affirm the trial court's judgment.

¶ 44 Affirmed.