2023 IL App (1st) 220230-U

FIFTH DIVISION
January 12, 2024

No. 1-22-0230

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 10114 |
| | ) | |
| RANDY HAGGARD, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Justices Lyle and Navarro concurred in the judgment.

**O R D E R**

¶ 1   *Held*:  Defendant's conviction for one count of robbery is affirmed; sufficient evidence was presented at trial, the court did not abuse its discretion in limiting the testimony of an expert witness, and defendant's right to due process was not violated when the court commented on defense counsel's objections.

¶ 2   Following a jury trial, defendant Randy Haggard was convicted of robbery. On direct appeal from that conviction, Mr. Haggard raises three issues: (1) whether the testimony of a single eyewitness was sufficient evidence to support his conviction, (2) whether the trial court abused its discretion by preventing an expert in forensic psychology from testifying that certain factors

present during the alleged encounter could "undermine," as opposed to "affect," the reliability of the witness's memory, and (3) whether Mr. Haggard's right to due process was violated when, during closing arguments, the court stated that defense counsel was making baseless objections.

¶ 3    For the reasons that follow, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5    The State charged Randy Haggard with one count of aggravated robbery under section 18-1 of the Criminal Code of 2012 (720 ILCS 5/18-1(b)(1) (West 2018)) stemming from an event that occurred in the early morning of June 6, 2019.

¶ 6    At trial, Brittany Hunt, the complaining witness, testified to the following facts. She arrived at her home in Chicago's west side around midnight on June 6, 2019, after a trip to South Bend, Indiana. She parked her car across the street from her basement apartment. As she stepped out of the car, she was carrying her purse, two bags, and a cell phone on which she was talking to her boyfriend on speaker.

¶ 7    Ms. Hunt crossed the street from where she parked and approached her apartment. When she arrived at the sidewalk in front of her home, she noticed a person walking toward her. He was about three houses down and "stumbling, like, basically doing like zigzags, as if he was drunk."

¶ 8    Ms. Hunt checked her mail at the mailbox. She continued to observe the man. At trial, the prosecutor asked her why she was so observant. Ms. Hunt replied, "I'm a female. It's late at night. I normally don't go in the house that late. So, just check. You know, being aware of my surroundings."

¶ 9    Ms. Hunt described the approaching man as "dark skin[ned]" with "a scruffy beard, a small, like nappy fro; and he had a—like a hat rolled up on top of his head." She stated he was about 5' 3" or 5' 4," and she assumed he was around her age; she was 27 at the time.

¶ 10    Ms. Hunt then entered the gate and went up the stairs toward her front door. The front porch did not have a light. The man she had observed continued to walk by. As soon as he got past the opening of Ms. Hunt's gate though, he turned around. Ms. Hunt testified that that was when she "had a clear view of his face."

¶ 11    The man rolled a black ski mask down to cover his face, entered the gate, and went up the stairs. Ms. Hunt noted that he had his left hand in his hoodie pocket while his right hand was free. The man told her to "give me that," referring to her purse.

¶ 12    According to Ms. Hunt, the man grabbed her purse, and she grabbed it back. The two "tussl[ed] over the bag." Ms. Hunt testified that she did not want the man to take her purse because she knew it contained her rent money—$500—as well as her "credit cards, ID, *** fingernail polish *** and two diamond rings."

¶ 13    During the struggle, Ms. Hunt stated the man "tried to, like, sling [her]" and she fell, striking her knee on the ground. At this point, believing he may have a gun because his hand was in his pocket, she let go of the purse. The man ran away.

¶ 14    She went down the stairs and called after him saying, "I called the Police. I saw your face, stupid." The man turned around and made like he was going to come back. At this point, Ms. Hunt testified that she turned as if to enter the house and he continued to run away.

¶ 15    Ms. Hunt called the police, who arrived in about 10 minutes. The officers were wearing body cameras, and defense counsel published the recorded footage into evidence for the jury.

¶ 16    The recording shows Ms. Hunt stating that she felt like she had seen the man who robbed her before. Ms. Hunt also said the man was about her height—5' 2"—or shorter. The perpetrator's face was "mostly smooth" and had a "little bit" of facial hair.

¶ 17    At trial, Ms. Hunt testified that, after thinking about it, she believed she recognized the man

from seeing him "maybe, like twice," at a nearby gas station. Ms. Hunt further testified that, unless she was mistaken, she thought she told the officers that the man had a "chubby" build—although that does not appear in the police video. Both in her testimony and in the video footage, she stated that the perpetrator fled in the same direction from which he came before turning to enter a nearby "field," which she identified at trial as a vacant lot west of her home on the north side of the street.

¶ 18    On cross-examination, Ms. Hunt described the nearest streetlight as "approximately three" houses away from her home. She said that her emotional state at the time was "shooken up."

¶ 19    Detective Matthew Nelson testified that he called Ms. Hunt on June 8th, 2019. According to Detective Nelson, Ms. Hunt described the perpetrator as "a male black approximately 5-foot-1 to 5-foot-3, 25 years-old and [with a] short haircut, dark-brown complexion and chubby stature" whom she had seen previously in the neighborhood.

¶ 20    Police Officer Kyle Varney testified that he worked in the neighborhood. Near the time of the event, he read the case report about the incident. He stated that, while he was assigned to the area, he tried his "best to meet as many [residents] as [he] could." Knowing that Mr. Haggard lived nearby and believing that he matched Ms. Hunt's description, Officer Varney began to suspect that he was the person who had robbed Ms. Hunt.

¶ 21    Detective Nelson testified that he spoke with Officer Varney. Detective Nelson then used a computer application to generate a list of potential "fillers," which were people who matched Mr. Haggard's demographic characteristics for a photo lineup. He then chose five photos from among the computer-generated list to populate the other members of a photo array before adding a photo of Mr. Haggard.

¶ 22    Ms. Hunt testified that two detectives met with her at her workplace at a later date. She signed an advisory form that was published to the jury by the State. The form was dated "26 June

4

[20]19." The form indicated, among other things, that the perpetrator might not be in the photo array.

¶ 23 Detective Jeffrey Stanek testified that he was the second detective, besides Detective Nelson, who arrived at Ms. Hunt's work that day. He operated as the independent administrator of the photo array. His job was to, without a prior understanding of the case, "show the victim the photo array that was compiled by the other detective and then pretty much administer it to the victim."

¶ 24 According to Detective Stanek, Ms. Hunt looked at the photographs for "approximately two minutes" before pointing out Mr. Haggard. At trial, Ms. Hunt stated that she was "100 percent" certain at the time of the photo identification. During her cross-examination, Ms. Hunt stated that it did not take her "long at all to identify him." She also identified Mr. Haggard in court.

¶ 25 Officer Varney later arrested Mr. Haggard. Shortly after the arrest, he "eyeball[ed]" Mr. Haggard's height as around 5' 6." Mr. Haggard was 18 years old at the time.

¶ 26 Defense counsel called Dr. Kim McClure, a professor of forensic psychology at Western Illinois University, as an expert to testify about how the brain encodes events as memories and how Ms. Hunt's identification may have been flawed as a result of certain factors present that may have impacted the encoding. Dr. McClure testified about how certain factors, such as stress, the brain's desire to make sense of an event, and the use of disguises can negatively affect that process generally.

¶ 27 Before Dr. McClure could discuss which factors, of the ones she knew of generally, were present in Ms. Hunt's interaction with the man Ms. Hunt identified as Mr. Haggard, the court objected.

¶ 28 The court initially ruled Dr. McClure would not be permitted to testify as to which factors

were present during the confrontation between the perpetrator and Ms. Hunt. After a recess, however, the court returned and modified its initial ruling. Dr. McClure could testify about which factors were present at the time so long as she did not use the word "undermine" to describe how the factors could impact the memory encoding process.

¶ 29    Dr. McClure then testified that poor lighting, Ms. Hunt's divided attention, the perpetrator's use of a disguise, and Ms. Hunt's high stress level all would have negatively affected Ms. Hunt's memory. Dr. McClure further testified about "unconscious transference," which she described as a process by which the brain engages in a kind of "source-monitoring error where you think you've seen someone in one context and you're mistaken about that and you think then, oh, this must be the same person when, in fact, it's not the same person." According the Dr. McClure, the "defining characteristic" of Ms. Hunt's description of the perpetrator, as portrayed in the video with the responding officers, was that Ms. Hunt recognized the attacker from the neighborhood. Because only one member of the photo array was from the neighborhood, Ms. Hunt may have engaged in unconscious transference and misidentified the source of her memory as Mr. Haggard.

¶ 30    The jury found Mr. Haggard not guilty of aggravated robbery but guilty of the lesser included offense of robbery. 720 ILCS 5/18-1(a) (West 2018). Mr. Haggard was sentenced to 24 months of probation and ordered to pay $500 in restitution.

¶ 31                                II. JURISDICTION

¶ 32    Mr. Haggard was sentenced on February 7, 2022. He timely filed his notice of appeal the next day. We have jurisdiction over this appeal under article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb 6, 2013) and 606 (eff. July 1, 2017), governing appeals from final judgments in criminal cases.

¶ 33                                    III. ANALYSIS

¶ 34            A. There Was Sufficient Evidence To Support the Robbery Conviction

¶ 35    Mr. Haggard argues that the State's evidence, which consisted solely of Ms. Hunt's identification, was insufficient for a reasonable juror to find him guilty beyond a reasonable doubt.

¶ 36    When a defendant claims that the evidence is insufficient, this court must determine whether, after viewing that evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense proved beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). "This standard of review does not allow the reviewing court to substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009).

¶ 37    Identification of a defendant by a single witness is sufficient to sustain a conviction if the witness viewed the defendant under circumstances that permitted a positive identification. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). Our supreme court has identified five factors, often referred to as the "*Biggers* factors," that courts can look to in assessing whether an eyewitness identification is sufficient evidence on which to sustain a conviction. These are: (1) the witness's opportunity to view the offender at the time of the offense; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the offender; (4) the witness's level of certainty at the identification confrontation; and (5) the length of time between the offense and the identification confrontation. *People v. Lewis*, 165 Ill. 2d 305, 356 (1995) (citing *Neil v. Biggers*, 409 U.S. 188 (1972)). No single factor is dispositive; we consider the totality of the circumstances. *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 89.

¶ 38    Mr. Haggard argues that the first factor, the witness's opportunity to view the offender,

weighs against a finding of reliability. It was night. The street was poorly lit. The nearest streetlight was three houses away. Ms. Hunt's home had no porch light.

¶ 39     The State counters that Ms. Hunt stated that she observed the perpetrator from the moment she initially noticed him walking toward her. In addition, Ms. Hunt testified that she had an opportunity to see the offender's face at close range as he walked past her gate, before he pulled his mask down over his face.

¶ 40     While we agree with Mr. Haggard that the opportunity for observation was lessened by the limited light, we also agree with the State that Ms. Hunt observed her attacker for an extended period of time as he approached her from about three houses away and then as he walked past her front gate. All this time his face was not covered by a mask.

¶ 41     The second *Biggers* factor is the degree of attention. Ms. Hunt was carrying multiple bags, checking her mail, and talking on the phone with her partner. Ms. Hunt testified that, while she was engaged in those other activities, she also placed attention on the approaching man because it was late at night and she was a woman. Again, there are aspects of this factor that weigh in both directions.

¶ 42     The third factor is the accuracy of the witness's prior description of the offender. Ms. Hunt told police at the scene that the perpetrator was in his late twenties and was about "her height or shorter." Mr. Haggard was 18 at the time. According to Officer Varney, he was slightly taller than Ms. Hunt. Mr. Haggard argues that the descriptions were most "egregiously contradictory" where Ms. Hunt testified at trial that Mr. Haggard had a "scruffy beard," but she had told the responding officers that he was "mostly smooth" and had a "little bit" of facial hair. Mr. Haggard argues these inconsistencies undermine Ms. Hunt's identification.

¶ 43     The State counters that the gist of Ms. Hunt's description was that the perpetrator was

young and generally short. She also accurately described his skin tone and hair style. The State also cites to the video recording where Ms. Hunt tells the responding officers that the perpetrator's face had a "little bit" of facial hair which was roughly consistent with her testimony at trial.

¶ 44    Mr. Haggard's argument rests primarily on these first three factors, which he claims all undermine the reliability of the identification. He also argues that we have referred to the first factor as the "most important" (*In re O.F.*, 2020 IL App (1st) 190662, ¶ 32) and that the poor lighting was particularly troubling here. But none of these factors clearly undermine Ms. Hunt's testimony. Rather, each of them, while offering some support for the possibility that Ms. Hunt could have been mistaken, also support the reliability of Ms. Hunt's identification.

¶ 45    Moreover, as we reiterated in *O.F.*, "*Biggers* instructs that all factors are to be considered with no single factor conclusively establishing the reliability of identification testimony." *Id.* Here the final two factors provide even more support for our conclusion that a reasonable jury could find Ms. Hunt's identification credible.

¶ 46    The fourth *Biggers* factor is the witness's level of certainty. Ms. Hunt testified that she was "100 percent" certain at the time of the photo array. Mr. Haggard points out that Detective Stanek testified that Ms. Hunt looked at the photo lineup for approximately two minutes before making her identification. The detective also testified that Ms. Hunt did not hesitate at all when she identified Mr. Haggard. We find no reason to conclude that the time Ms. Hunt spent looking at the photo array necessarily undermined her certainty in identifying Mr. Haggard.

¶ 47    The final *Biggers* factor is the length of time between the offense and the identification confrontation. Twenty days elapsed between the robbery on June 6, 2019, and the photo array identification on June 26, 2019. As the State points out, 20 days represents a relatively short amount of time between a crime and a victim's opportunity to identify the perpetrator. Indeed, our

supreme court has found that as much as a two-year lapse between the crime and the identification did "not destroy the witness's credibility." *People v. Rodgers*, 53 Ill. 2d 207, 214 (1972).

¶ 48    Viewing the *Biggers* factors as a whole, and not considering any one factor in isolation, we find the identification evidence sufficient. While it was dark, the street was not unlit. Ms. Hunt had a relatively long time to view the perpetrator. While she might have been distracted by talking on the phone and carrying bags, she was also focused because it was late and dark. Her description, while not a perfect match with Mr. Haggard, was fairly accurate. She was confident of her identification. The amount of time between the identification and the encounter was relatively short. A reasonable juror could have credited the identification. Thus, we reject Mr. Haggard's argument that his conviction must be reversed because the evidence—based on Ms. Hunt's identification—was insufficient.

¶ 49    B. The Trial Court Did Not Abuse Its Discretion in Limiting Dr. McClure's Testimony

¶ 50    The second issue on appeal is whether the trial court abused its discretion in its limitation on Dr. McClure's testimony.

¶ 51    During the trial, the following exchange occurred after Dr. McClure had testified at some length about how various factors impact eyewitness identification generally:

> "[DEFENSE ATTORNEY MS. WINTERHALTER]: When you reviewed initial body-worn cameras from this case did you notice anything affecting the [memory's quality]?
>
> [No objection was recorded]
>
> THE COURT: Sustained. Let's have a side bar.
>
> (The following proceedings were had at side bar.)
>
> THE COURT: If you think she's going to testify about some circumstance in this

case in particular that affects the reliability of the identification you have another think coming.

MS. WINTERHALTER: Your Honor, that's what I—

THE COURT: No. She can testify consistent with [*People v.*] *Lerma*, [2016 IL 118496], about the various factors that can impact the identification. She can't say that she looked at this factor or this factor in this particular case, that *** affects the reliability of the identification. That just can't happen, it's not going to happen. I'll direct your attention to *People v. Corral*, 2019 Ill. App. 1st 171501 which happens to have involved this witness. I'll give you *Corral* if you want to read it over, but you're not doing this, not this way."

¶ 52    The trial went into recess. Upon returning, the court modified its ruling that Dr. McClure would not be permitted to testify regarding Ms. Hunt's specific identification of Mr. Haggard. The following exchange occurred:

"THE COURT: *** I'll give you a little more latitude than I was suggesting during the side bar just as I rehashed it, but no expert witness nor any other witness consistent with *People v. Corral* is going to testify that in their opinion some identification in this case is undermined or not reliable.

* * *

THE COURT: And we'll not use the term undermine because nobody is going to opine that identifications are undermined in this room. Are we clear on that?

MS. WINTERHALTER: If the science says certain things may undermine can we—

THE COURT: No. May affect.

MS. WINTERHALTER: May affect. I get that."

¶ 53    The trial court in this case, based on its understanding of our decision in *People v. Corral*, 2019 IL App (1st) 171501, first suggested that Dr. McClure could not testify at all about Ms. Hunt's actual identification and why it might have been unreliable. The court later modified its ruling to limit Dr. McClure's testimony about Ms. Hunt's specific identification such that she could not say that any factor "undermined" the identification.

¶ 54    The trial court relied on two opinions. In *Lerma*, 2016 IL 118496, ¶ 26, our supreme court held that it was an abuse of discretion to deny a defense request to present an expert's report on the reliability of an eyewitness identification. The court recognized that scientific research about eyewitness identification was "well settled, well supported and, in appropriate cases a perfectly proper subject for expert testimony." *Id.* ¶ 24.

¶ 55    In *Corral*, the trial court allowed the defendant's expert (who, as it so happened, was Dr. McClure) to testify on the reliability of an eyewitness identification. *Corral*, 2019 IL App (1st) 171501, ¶ 114. The trial court limited, however, her testimony to prevent Dr. McClure from commenting directly on another witness's credibility. *Id.* As we articulated, "[w]hile the express issue of whether an eyewitness expert could ultimately opine on the reliability of another witness's identification of an offender was not discussed in *Lerma*, under Illinois law, it is generally improper to ask one witness to comment directly on the credibility of another witness." *Id.* ¶ 113. Because the trial court in *Corral* had, consistent with *Lerma*, allowed Dr. McClure to testify but only prevented her from opining that an eyewitness was unreliable, we affirmed. *Corral*, 2019 IL App (1st) 171501, ¶ 114.

¶ 56    The trial court in this case ruled that Dr. McClure could not testify that any factor present in the interaction between Ms. Hunt and the perpetrator "undermined" the memory encoding process that led to Ms. Hunt's identification of Mr. Haggard. Specifically, when defense counsel

asked "if science says certain things may undermine can we ***," the court responded: "No. May affect."

¶ 57    The trial court was clearly attempting to honor our supreme court's recognition in *Lerma* that expert testimony is usually appropriate where the State's case rests on eyewitness testimony and the *Corral* court's recognition that one witness should not comment on the credibility of another. The line that must be drawn between those two concepts may be tricky at times. While we agree with the trial court that Dr. McClure should not have been permitted to testify that Ms. Hunt's identification was "not reliable" or to say definitively that something "undermined" that identification, defense counsel's request to allow Dr. McClure to testify that science generally says certain things "may undermine" an identification seems to us to be permitted by those cases.

¶ 58    But even if the line the trial court drew here was not precisely what is required by *Lerma* and *Corral*, it had no impact on Dr. McClure's testimony or on Mr. Haggard's conviction. If it was error at all it was surely harmless beyond a reasonable doubt, as it did not contribute to the defendant's conviction. *Lerma*, 2016 IL 118496, ¶ 33.

¶ 59    While Dr. McClure was required by the court to use the word "affect," where she might have preferred to use the word "undermine," her testimony as a whole remained clear. Before the court interrupted Dr. McClure, she had already testified as to how various factors, such as divided attention, stress, and subsequent conversations about the encounter could "potentially undermine the reliability of eyewitness testimony." After the court issued its ruling limiting her testimony, Dr. McClure was still permitted to testify about which of these factors were relevant to Ms. Hunt's identification of Mr. Haggard and which could have "affected" that identification.

¶ 60    She testified specifically that "low lighting," "divided attention," and the "interview with the responding officers" can "*affect* a witness'[s] memory" (emphasis added). Removing any doubt

13

about what she meant by "affect," Dr. McClure went on to state that the factors present at the time would make "it harder for us to encode and hold onto those experiences and they can increase inaccuracies in our retelling of an experience." She explained,

> "if we are doing multiple things at once, if we're on our phone, if we're trying to find our keys to get in our door, if we are on the phone talking with someone it's going to make it really challenging for us to really see things in our environment that maybe should be paid attention to. And because we don't encode that information in low lighting *** it's not retained in our memory and our memory is likely to be *affected* by it." (Emphasis added.)

¶ 61    Dr. McClure also testified that "Ms. Hunt was not familiar with her neighborhood" and "when there's this lack of familiarity with an area and with a neighborhood it's really possible for someone to mistake one person for another." While Dr. McClure was not permitted to use the word "undermine," her testimony and the potential problems with Ms. Hunt's identification were clearly and fully presented to the jury.

¶ 62    In sum, we agree with the State that any potential error committed by the trial court was harmless.

¶ 63              C. Mr. Haggard's Right to Due Process Was Not Violated

¶ 64    Mr. Haggard's final argument on appeal is that his right to due process was violated when, during closing arguments, the court accused defense counsel of making baseless objections.

¶ 65    The State contends that Mr. Haggard has forfeited this claim by failing to include this argument in his post-trial motion. However, as Mr. Haggard points out, he objected to these comments at trial and is making a constitutional claim. Our supreme court has held that such a claim can be considered on direct appeal and is not subject to forfeiture. See *People v. Almond*, 2015 IL 113817, ¶ 54 ("[C]onstitutional issues that were previously raised at trial and could be

raised later in a postconviction petition are *not* subject to forfeiture on direct appeal." (Emphasis in original.)). Thus, while we agree that Mr. Haggard's claim is not subject to forfeiture, we find that the conduct of the trial judge in this case did not rise to the level of a due process violation.

¶ 66    Mr. Haggard relies on cases, such as our supreme court's decision in *People v. Lewerenz*, 24 Ill. 2d 295, 301 (1962), where the supreme court recognized that it could violate due process for a trial court "to constantly disparage counsel and to berate" defense counsel. But in *Lewerenz*, the trial court admonished counsel in front of the jury 16 times. *Id.* at 300. It was in that context that the supreme court found the remarks of the trial judge were "prejudicial error." *Id.* at 301.

¶ 67    Our supreme court has long recognized that allegations of judicial bias or prejudice must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the events taking place. *People v. Jackson*, 205 Ill. 2d 247, 277 (2001). A judge's display of displeasure or irritation with an attorney's behavior is not necessarily evidence of judicial bias against the defendant or his counsel. *Id*. at 275.

¶ 68    It is also well settled that "[a] prosecutor is allowed wide latitude during closing arguments" and "may comment on both the evidence presented at trial, as well as any fair, reasonable inferences therefrom, even if such inferences reflect negatively on the defendant." *People v. Rogers*, 2015 IL App (2d) 130412, ¶ 74.

¶ 69    We agree with the State that the court's comments must be viewed in the context of the wide latitude afforded counsel during argument and the fact that the trial court did not interject until defense counsel had made seven objections in quick succession during the prosecutor's argument.

¶ 70    The first objection came shortly after the prosecutor had begun rebuttal. The defendant objected in response to the prosecutor saying, "how could you possibl[y] say that Brittany Hunt

did not have a clear opportunity to view this defendant as he was coming to rob her.”

¶ 71    The second came two paragraphs later when the State tried to explain why there were discrepancies between Ms. Hunt’s description of the perpetrator to the responding officers and her description to Detective Nelson:

> “[ASSISTANT STATE’S ATTORNEY] MS. JENKINS: *** some of [the] discrepancies that the Defense pointed out [weren’t] necessarily because Brittany had a failure of memory. It could be explained by other more reasonable things; for example, perhaps the detective when he called Brittany on the phone asked her different questions than the police officer asked.
>
> [DEFENSE ATTORNEY] MS. HEYRMAN: Objection. That's not in evidence.
>
> THE COURT: Overruled.”

¶ 72    Two paragraphs later, defense counsel made another two objections:

> “MS. JENKINS: *** Now, a hand in a pocket certainly as the Defense told you can be an innocent gesture, certainly it can, but in this circumstance on a lone night when this man was attacking that female who was alone walking up to her house—
>
> MS. HEYRMAN: Objection.
>
> THE COURT: Overruled.
>
> MS. JENKINS: *** and he kept his hand in his pocket as he ran up the steps getting ready to attack this woman—
>
> MS. HEYRMAN: Objection.
>
> THE COURT: Overruled. It’s argument.”

¶ 73    One paragraph later, defense counsel made her fifth objection:

> “MS. JENKINS: The [responding] police officers asked [Ms. Hunt] if he had a

weapon ***. She didn't know if he had a weapon or not. She didn't see one but as she had a chance to speak further about it—

MS. HEYRMAN: Objection.

THE COURT: Overruled."

¶ 74   The sixth and seventh objections, and the court's comments, came one paragraph later:

"MS. JENKINS: *** She said she's five-two so he's probably five-two, the arresting officer thinks maybe he's five-six so you have a four-inch discrepancy there. Now, I don't know about all of you but I know a lot of people are pretty bad at estimating heights, weights, distances. There's a whole carnival game surrounding this, guess somebody's weight.

MS. HEYRMAN: Objection.

THE COURT: Overruled.

MS. JENKINS: That's something that's hard to do, but when Brittany Hunt said the defendant is five-two she meant generally—

MS. HEYRMAN: Objection.

THE COURT: Overruled. Let's make objections that have some basis, not objections that are baseless and are designed to interfere with the State's argument. They didn't do it to you all, don't make it to them. ***

We're all set, thank you. I'm cognizant of what is and what isn't proper argument. You can sit down. It's not necessary to stand and make argument and objection in this courtroom."

¶ 75   We agree with Mr. Haggard that it would have been preferable for the court to have made this last statement outside the jury's presence. As we have said before, "[p]erhaps the court could

17

have shown a touch more patience when dealing with defense counsel"; however, a "defendant is entitled to a fair trial and not a perfect trial." *People v. Faria*, 402 Ill. App. 3d 475, 482 (2010).

¶ 76    In this case, nothing in the trial court's conduct deprived Mr. Haggard of a fair trial. We agree with the trial court that the majority of defense counsel's objections were meritless. The State is allowed to make reasonable inferences based on the evidence presented at trial. Putting forth hypothetical reasons to explain minor discrepancies, or attempting to counter the defense argument that a hand in the pocket could be innocent, both fall comfortably within the "wide latitude" we afford during closing arguments. *Rogers*, 2015 IL App (2d) 130412, ¶ 74.

¶ 77    In his brief, Mr. Haggard focused on the last two objections. In those two situations, the State's comments also appear to be reasonable inferences from the evidence. But even assuming these last two objections had some merit, we understand why, on this record, the trial court would have viewed defense counsel's "design" as having more to do with interfering with the State's argument than with presenting meritorious objections. The two objections Mr. Haggard highlights came after a string of closely spaced objections that made it difficult for the prosecutor to communicate with the jury. The court's comment addressing that fact did not deny Mr. Haggard his right to due process.

¶ 78                                IV. CONCLUSION

¶ 79    For the foregoing reasons, we affirm Mr. Haggard's conviction for robbery.

¶ 80    Affirmed.